## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

OUTSOURCING FACILITIES
ASSOCIATION
1050 Connecticut Ave., NW
Suite 1100
Washington, D.C. 20036-5403,

Plaintiff,

v.

XAVIER BECERRA
*in his official capacity as*
*Secretary of Health and Human Services*
200 Independence Avenue, SW
Washington, DC 20201,

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES
200 Independence Avenue, SW
Washington, DC 20201,

ROBERT M. CALIFF
*in his official capacity as*
*Commissioner of Food and Drugs*
10903 New Hampshire Avenue
Silver Spring, MD 20993, and

U.S. FOOD AND DRUG
ADMINISTRATION
10903 New Hampshire Avenue
Silver Spring, MD 20993,

Defendants.

Civil Action No. 22-1702

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Outsourcing Facilities Association ("OFA") brings this complaint against Defendants Xavier Becerra, Robert Califf, U.S. Department of Health and Human Services ("HHS"), and U.S. Food and Drug Administration ("FDA") (collectively, "Defendants") for violating the Administrative Procedure Act ("APA"). In support thereof, OFA states the following:

**NATURE OF ACTION**

1.      This action challenges as a violation of the Administrative Procedure Act Defendants' unreasonable delay in carrying out Congress's directive to list the bulk drug substances (*i.e.*, active pharmaceutical ingredients) "for which there is a clinical need." 21 U.S.C. § 353b(a)(2)(A)(i). Congress assigned this task to the HHS Secretary nearly a decade ago. Yet, Defendants still have not listed a single bulk drug substance for compounding sterile drugs.

2.      In November 2013, Congress quickly reacted to an urgent crisis in the nation's supply of safely compounded sterile drugs by creating a new type of FDA-regulated entity called "the drug compounding outsourcing facility." These facilities are also known as "503B facilities" because they were created by Section 503B of the Food, Drug, and Cosmetic Act ("FD&C Act") to safely compound sterile drugs. Plaintiff Outsourcing Facilities Association ("OFA") is a trade association whose members responded to Congress's urgent call by making substantial investments to establish 503B facilities and register them with the U.S. Food and Drug Administration ("FDA").

3.      Congress intended 503B facilities to supply safely compounded sterile drugs to the nation's healthcare providers using bulk drug substances for which there is a clinical need and directed the HHS Secretary to list those substances in the Federal Register using 60-day

notice and comment procedures. 21 U.S.C. § 353b(a)(2)(A)(i). The Secretary delegated that responsibility to FDA, which refers to the list as the "503B Bulks List."

4.      In more than eight years, however, FDA has added only four substances to the 503B Bulks List, all of which are for compounding topical dosage forms, not sterile drugs. Defendants' unreasonable delay in identifying the bulk drug substances for which there is a clinical need is thwarting Congress' purpose in creating 503B facilities and hurting public health by denying healthcare providers' access to the safely compounded sterile drugs their patients need.

5.      In 2018, FDA established a process to publicly categorize nominations for adding a bulk drug substance to the 503B Bulks List. The categorization of nominations is how FDA indicates whether the nominator provided sufficient information for FDA to act on the nomination or if the nominator must supply more information. FDA stated at the time that it would categorize nominated substances monthly. Yet, FDA has not categorized many of the nominations it has received, including more than 30 of the OFA-nominated substances. More than half of those OFA-nominated substances were submitted to FDA more than three years ago.

6.      Defendants should comply with Congress's directive to list the bulk drug substances for which there is a clinical need so the facilities Congress created to compound sterile drugs for the nation's healthcare providers can serve public health as Congress intended. At a minimum, FDA should follow its own policy by promptly categorizing the nominations that have languished in regulatory limbo for years and categorize any new nominations monthly as it said it would.

**PARTIES**

7.      Plaintiff Outsourcing Facilities Association is the trade association representing FDA-registered outsourcing facilities ("503B facilities") operating pursuant to Section 503B of the FD&C Act. OFA's members provide compounding services to patients, healthcare providers, and healthcare facilities, and strive to ensure the specific needs of both providers and patients are met with safe and effective compounded and/or repackaged medications. OFA has been actively following FDA's implementation of the Compounding Quality Act ("CQA") and has brought together members of industry to advocate for a safe, reasonable and practical rollout of the CQA. OFA's offices are located at 1050 Connecticut Ave., NW Suite 1100, Washington, D.C. 20036-5403.

8.      Defendant Xavier Becerra ("Secretary") is Secretary of U.S. Health and Human Services ("HHS"). He maintains offices at 200 Independence Avenue, SW, Washington, D.C. 20201. In his capacity as Secretary, he is responsible for the conduct and policies of HHS. Defendant Becerra, by and through his designees at HHS, has delayed and withheld the agency action Congress required. His governmental activities occur in this District and nationwide. Defendant Becerra is sued solely in his official capacity.

9.      Defendant Robert Califf ("Commissioner") is Commissioner of the U.S. Food and Drug Administration ("FDA"). FDA is the agency that administers the programs under the Federal Food, Drug, and Cosmetic Act ("FD&C Act"). Defendant Califf, by and through his designees at FDA, has delayed and withheld the agency action Congress required. His governmental activities occur in this District and nationwide. Defendant Califf is sued solely in his official capacity.

4

10.     Defendant HHS is a cabinet-level department of the United States government. Its headquarters and principal place of business are at 200 Independence Avenue, SW, Washington, D.C. 20201. Its governmental activities occur in this District and nationwide.

11.     Defendant FDA is an agency of the United States and a division of HHS. FDA's headquarters and principal place of business are at 10903 New Hampshire Avenue, Silver Spring, MD 20993. Its governmental activities occur in this District and nationwide. FDA is the federal agency in charge of administering the FD&C Act, including implementation of the Drug Quality and Security Act of 2013 ("DQSA").

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action presents a case and controversy under the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq. ("FD&C Act") and the Administrative Procedure Act, 5 U.S.C. § 551 et seq. ("APA").

13.     Plaintiff's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, 5 U.S.C. § 706, 28 U.S.C. § 1361, 28 U.S.C. § 1651(a), Rules 57 and 65 of the Federal Rules of Civil Procedure, and the general legal and equitable powers of this Court (which exist even absent a finding of unreasonable delay).

14.     OFA has standing because it, and at least one of its members, have been and continue to be harmed by Defendants' delay in identifying the bulk drug substances "for which there is a clinical need," as required under 21 U.S.C. § 353b(a)(2)(A)(i). These injuries would be redressed by requiring Defendants to fulfil their obligation to identify those bulk drug substances. Through this lawsuit, OFA seeks to vindicate interests that are germane to its purposes. Litigation will not be adversely affected by the absence of the individual members of

OFA as named parties in this lawsuit. Consistent with its purpose as a trade association whose members are outsourcing facilities registered under Section 503B of FD&C Act, OFA, as well as its members, nominated substances that FDA should identify as bulk drug substances for which there is a clinical need. OFA has expended and continues to expend resources because of Defendants' unlawful delay in identifying the bulk drug substances for which there is a clinical need. OFA submitted a citizen petition to FDA under 21 C.F.R. § 10.30, dated September 30, 2020, requesting, among other things, that FDA establish the list of bulk drug substances for which there is a clinical need within the next 180 days. FDA denied the petition on January 25, 2021. One or more of OFA's members would compound sterile drugs pursuant to Section 503B using the nominated substances if FDA identified them as substances for which there is a clinical need.

15.    Venue lies in this district under 28 U.S.C. § 1391(e) in that Defendants Becerra and Califf are officers and employees of a United States agency, Defendants reside in the District of Columbia, a substantial part of the events giving rise to this claim occurred in the District of Columbia, Plaintiff resides in this district, and no real property is involved in the action. Venue also lies in this district under 5 U.S.C. § 703 because there is no special statutory procedure for appeal and this court is a court of competent jurisdiction.

## STATUTORY AND REGULATORY BACKGROUND

**A.    Congress created Section 503B outsourcing facilities to compound sterile drug products for the nation's healthcare providers.**

16.    In November 2013, Congress created a new category of regulated entity—drug compounding outsourcing facilities—by adding Section 503B to the FD&C Act. Compounding Quality Act ("CQA") (Title I of the Drug Quality and Security Act ("DQSA")), Pub. L. No. 113-54, 127 Stat. 587 (2013).

17.     A drug compounding "outsourcing facility"—also known as a 503B facility—is defined in Section 503B of the FD&C Act as "a facility at one geographic location or address that (i) is engaged in the compounding of sterile drugs; (ii) has elected to register as an outsourcing facility; (iii) and complies with all of the requirements of this section." 21 U.S.C. § 353b(d)(4). A "sterile drug" is one "intended for parenteral administration, an ophthalmic or oral inhalation drug in aqueous format, or a drug that is required to be sterile under Federal or State law." 21 U.S.C. § 353b(d)(5). Compounding is the act of "combining, admixing, mixing, diluting, pooling, reconstituting, or otherwise altering of a drug or bulk drug substance to create a drug." 21 U.S.C. § 353b(d)(1).

18.     Congress enacted the DQSA—creating 503B facilities—to remedy the legacy of unregulated and unsafe compounding practices for sterile drugs, culminating in a 2012 outbreak of fungal meningitis that killed more than 60 people and infected 750 others when the New England Compounding Center (NECC)—which was not a 503B facility—compounded purportedly sterile drugs that were tainted with bacterial and fungal contamination. Congress immediately held hearings to determine how to ensure healthcare providers would have a safe supply of compounded sterile drugs so that another NECC-type tragedy would not recur. *See Hearing on the Fungal Meningitis Outbreak: Could It Have Been Prevented?* 112th Cong. (Nov. 14, 2012). Congress reacted with urgency to find a legislative solution. *See* 159 Cong. Rec. 14,650 (2013) (statement of Rep. Murphy) ("How we got here is a tragedy."); S. Hrg. No. 113-756, at 22 (statement of Sen. Baldwin) ("Last year's tragic meningitis outbreak underscored the importance of updating Federal compounding policy."); 159 Cong. Rec. 14,647 (2013) (statement of Rep. Pitts) (explaining Congress sought to "prevent against another tragedy like NECC's"); H. Ser. No. 113-31, at 7 (statement of Rep. Upton) ("We have to do something that is

truly effective to prevent this from happening again."); *id.* at 9 (statement of Rep. Waxman) ("Our most critical task is to answer this question: how can we prevent another NECC tragedy from occurring again?").

19.     At the same time, Congress recognized that "[w]ithout compounders, doctors would not perform surgeries. Without compounders, oncologists would be forced to administer alternative chemotherapy drugs. Without compounders, patients would suffer from limited access." 159 Cong. Rec. S8071-04 (daily ed. Nov. 18, 2013) (statement of Sen. Boozman). Recognizing the urgent need for healthcare providers to have a safe supply of compounded sterile drugs, Congress expeditiously passed the DQSA, paving the way for compounding of sterile drugs from bulk drug substances to be carried out by newly created entities—503B facilities—that are held to the most stringent federal standards for compounding sterile drugs.

20.     To ensure that healthcare providers have access to safe, compounded drugs, Congress intended 503B facilities to compound sterile drugs for hospitals, clinics, and healthcare practitioners to keep on hand as "office stock" for patients who present with an immediate need for them. 503B facilities provide their compounded sterile drugs directly to the healthcare providers that need them as drugs compounded by 503B facilities cannot be sold or transferred by an entity other than the FDA-registered facility that compounded them. 21 U.S.C. §§ 353b(a)(8). Other compounders, such as state-licensed pharmacies (sometimes referred to as "traditional compounders"), compound drugs solely based on the receipt of a prescription for an identified, individual patient. 21 U.S.C. § 353a.

21.     503B facilities are FDA-registered and FDA-inspected. 21 U.S.C. §§ 353b(b)(1), 353b(b)(4). The bulk drug substances they use to compound drugs are each manufactured by

FDA-registered manufacturers. 21 U.S.C. § 353b(a)(2)(C). 503B facilities report both the drugs they compound and adverse events to the FDA. 21 U.S.C. §§ 353b(b)(2), 353b(b)(5).

22.     503B facilities are subject to more regulatory requirements and compound sterile drugs under more stringent conditions than traditional compounders, including being subject to current good manufacturing practice ("CGMP") requirements under section 501(a)(2)(B) of the FD&C Act. 21 U.S.C. § 351(a)(2)(B).

23.     503B facilities compound sterile drugs using active pharmaceutical ingredients from two different sources, either from a packaged, FDA-approved drug or from FDA-registered manufacturers of active pharmaceutical ingredients. When a 503B facility compounds a drug using active pharmaceutical ingredient sourced from an FDA-registered manufacturer of that substance it is referred to as compounding from a "bulk drug substance." 21 U.S.C. § 353b(a)(2).

24.     FDA defines "bulk drug substance" as follows: "Bulk drug substance, as referenced in sections 503A(b)(1)(A) and 503B(a)(2) of the Federal Food, Drug, and Cosmetic Act, means the same as 'active pharmaceutical ingredient' as defined in [21 C.F.R.] § 207.1(b)." 21 C.F.R. § 207.3. FDA defines the term "active pharmaceutical ingredient" as follows: "Active pharmaceutical ingredient means any substance that is intended for incorporation into a finished drug product and is intended to furnish pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body. Active pharmaceutical ingredient does not include intermediates used in the synthesis of the substance." 21 C.F.R. § 207.1.

25.     Congress authorized 503B facilities to compound drug products using bulk drug substances for which there is a "clinical need" and instructed the Secretary to establish the list "identifying bulk drug substances for which there is a clinical need" by

(I) publishing a notice in the Federal Register proposing bulk drug substances to be included on the list, including the rationale for such a proposal;

(II) providing a period of not less than 60 calendar days for comment on the notice; and

(III) publishing a notice in the Federal Register designating bulk drug substances for inclusion on the list.

21 U.S.C. § 353b(a)(2)(A)(i).

**B.    In more than eight years since Congress directed HHS to list the bulk drug substances for which there is a clinical need, Defendants have yet to list a single bulk drug substance for compounding sterile drugs.**

26.    On December 4, 2013, FDA opened a docket to solicit nominations of bulk drug substances for the 503B Bulks List, with a deadline of March 4, 2014. FDA, *Bulk Drug Substances That May Be Used To Compound Drug Products in Accordance With Section 503B of the Federal Food, Drug, and Cosmetic Act, Concerning Outsourcing Facilities; Request for Nominations*, 78 Fed. Reg. 72838 (Dec. 4, 2013). On July 2, 2014, FDA extended the deadline to September 30, 2014. FDA, *Bulk Drug Substances That May Be Used To Compound Drug Products in Accordance With Section 503B of the Federal Food, Drug, and Cosmetic Act, Concerning Outsourcing Facilities; Revised Request for Nominations*, 79 Fed. Reg. 37750 (July 2, 2014). By the September 30, 2014 deadline, FDA received nominations for the list of bulk drug substances for which there is a clinical need, yet did not make clinical need determinations regarding any of them.

27.    More than one year later, on October 27, 2015, FDA opened a new docket to again solicit nominations for the 503B Bulks List, but this time did not set a deadline for nominations. FDA, *Bulk Drug Substances That Can Be Used To Compound Drug Products in Accordance With Section 503B of the Federal Food, Drug, and Cosmetic Act; Establishment of a*

*Public Docket*, 80 Fed. Reg. 65770 (Oct. 27, 2015). In response to the October 27, 2015 notice, FDA again received nominations for the 503B Bulks List, including from OFA.

28.     FDA did not announce any clinical need determinations regarding any bulk drug substances until 2019, when it published a notice stating it had found "no clinical need for an outsourcing facility to compound using the bulk drug substances nicardipine hydrochloride and vasopressin and, therefore, we are not including nicardipine hydrochloride and vasopressin on the 503B Bulks List." FDA, *List of Bulk Drug Substances for Which There Is a Clinical Need Under Section 503B of the Federal Food, Drug, and Cosmetic Act*, 84 Fed. Reg. 7383 (March 4, 2019).

29.     On January 27, 2022, FDA decided not to include eight bulk drug substances on the 503B Bulks List. FDA, *List of Bulk Drug Substances for Which There is a Clinical Need Under Section 503B of the Federal Food, Drug, and Cosmetic Act*, 87 Fed. Reg. 4240 (Jan. 27, 2022) (diazepam, dipyridamole, dobutamine hydrochloride (HCl), dopamine HCl, edetate calcium disodium, folic acid, glycopyrrolate, and sodium thiosulfate (except for topical administration)).

30.     There are several other bulk drug substances that FDA has proposed not to include on the 503B Bulks List. *See* FDA, *List of Bulk Drug Substances for Which There is a Clinical Need Under Section 503B of the Federal Food, Drug, and Cosmetic Act*, 84 Fed. Reg. 7383 (March 4, 2019) (1: bumetanide); FDA, *List of Bulk Drug Substances for Which There is a Clinical Need Under Section 503B of the Federal Food, Drug, and Cosmetic Act*, 84 Fed. Reg. 46014 (Sept. 3, 2019) (8: ephedrine sulfate, famotidine, hydralazine hydrochloride, methacholine chloride, sodium bicarbonate, sodium tetradecyl sulfate, trypan blue, and vecuronium bromide); FDA, *List of Bulk Drug Substances for Which There is a Clinical Need Under Section 503B of*

*the Federal Food, Drug, and Cosmetic Act*, 85 Fed. Reg. 46126 (July 31, 2020) (13: hydroxyzine HCl, ketorolac tromethamine, labetalol HCl, mannitol, metoclopramide HCl, moxifloxacin HCl, nalbuphine HCl, polidocanol, potassium acetate, procainamide HCl, sodium nitroprusside, sodium thiosulfate, and verapamil HCl); FDA, *List of Bulk Drug Substances for Which There is a Clinical Need Under Section 503B of the Federal Food, Drug, and Cosmetic Act*, 86 Fed. Reg. 15673 (Mar. 24, 2021) (4: bromfenac sodium, mitomycin-C, nepafenac, and hydroxychloroquine sulfate).

31.    The DQSA does not require FDA to create a "no clinical need list" nor to propose not to include a substance on the 503B Bulks List yet FDA has decided to take such action.

32.    FDA did not list any substance on the 503B Bulks List until 2022, when FDA added four substances "for topical use only": Diphenylcyclopropenone (nominated on September 30, 2014; FDA-2013-N-1524-1363), glycolic acid (nominated on November 9, 2017; FDA-2015-N-3469-0035), squaric acid dibutyl ester (nominated on September 30, 2014; FDA-2013-N-1524-1363), and trichloroacetic acid (nominated on April 13, 2018; FDA-2018-D-1067-0005). FDA, *List of Bulk Drug Substances for Which There is a Clinical Need Under Section 503B of the Federal Food, Drug, and Cosmetic Act*, 87 Fed. Reg. 4240 (January 27, 2022). FDA placed these four substances on the 503B Bulks List only for compounding drugs that are "for topical use only" and *not* for compounding sterile drugs. *Id*.

33.    FDA is capable of final action on a nomination for the 503B Bulks List in under two years, as shown in the case of vasopressin. Vasopressin was nominated for the 503B Bulks List on April 1, 2017 (*see* FDA-2015-N-3469-0012 and FDA-2015-N-3469-0023) and FDA published its decision not to list the substance on March 4, 2019. FDA, *List of Bulk Drug Substances for Which There Is a Clinical Need Under Section 503B of the Federal Food, Drug,*

*and Cosmetic Act*, 84 Fed. Reg. 7383 (March 4, 2019).  That 23-month period included a 35-day government shutdown.

34.     In the context of new drug applications, FDA makes decisions on complete applications within 6 to 10 months. Making a clinical need determination based on a complete nomination is less complex than deciding a new drug application. Indeed, FDA has summarized its evaluation of bulk drug substances as involving only a few steps. FDA, *Evaluation of Bulk Drug Substances Nominated for Use in Compounding Under Section 503B of the Federal Food, Drug, and Cosmetic Act* at 18 (March 2019), available at https://www.fda.gov/media/121315/download. First, FDA considers "Is the nominated bulk drug substance a component of an FDA-approved drug product?" *Id.* If it is not, then FDA considers "(2) Do the following factors, taken together, weigh in favor of a finding that there is a clinical need for outsourcing facilities to compound using the nominated bulk drug substance? (a) The physical and chemical characterization of the substance; (b) Any safety issues raised by the use of the substance in compounding; (c) The available evidence of effectiveness or lack of effectiveness of a drug product compounded with the substance, if any such evidence exists; and (d) Current and historical use of the substance in compounded drug products, including information about the medical condition(s) that the substance has been used to treat and any references in peer-reviewed medical literature." *Id.* If, on the other hand, the nominated bulk drug substance is a component of an FDA-approved drug product, then FDA considers two more questions. "Is there a basis to conclude, for each FDA approved product that includes the nominated bulk drug substance, that (i) an attribute of the FDA-approved drug product makes it medically unsuitable to treat certain patients for the condition that FDA is evaluating, and (ii) the drug product proposed to be compounded is intended to address that attribute?" *Id.* And "Is there

a basis to conclude that the drug product proposed to be compounded must be produced from a bulk drug substance rather than from an FDA-approved drug product?" *Id.*

35.    "There is 'no per se rule as to how long is too long' to wait for agency action … but a reasonable time for agency action is typically counted in weeks or months, not years." *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004) (internal citation omitted). Yet, despite hundreds of nominations of bulk drug substances for compounding sterile drugs for the 503B Bulks List, to date—more than **eight years** after Congress directed the HHS Secretary to identify the bulk drug substances for which there is a clinical need so that 503B facilities could compound sterile drugs and supply them to the nation's health care providers— Defendants have not listed a single bulk drug substance for compounding sterile drugs on the 503B Bulks List. FDA has failed to do so despite the fact Congress, recognizing the urgency, expeditiously enacted the DQSA and defined a 503B outsourcing facility as one that "is engaged in the compounding of sterile drugs." 21 U.S.C. § 353b(d)(4).

36.    FDA's eight-year-plus delay is harming public health and undermining the statutory scheme by frustrating Congress's intent to give healthcare providers access to sterile drugs compounded using bulk drug substances at the type of facility Congress created for this purpose. Until FDA acts, healthcare providers are left to source such drugs from drug compounders who are not held to the same high standards as 503B facilities, or from 503B facilities who supply them at the mercy of FDA's enforcement discretion.

**C.    FDA has not followed its own policies and procedures for processing nominations for the 503B Bulks List, leaving nominations in regulatory limbo for years.**

37.    FDA established a process to categorize nominations in three categories:

503B Category 1 – Substances Nominated for the Bulks List Currently Under Evaluation: These substances may be eligible for inclusion on the 503B bulks list, were nominated

with sufficient supporting information for FDA to evaluate them, and do not appear on any other list.

503B Category 2 – Substances Nominated for the Bulks List That Raise Significant Safety Risks: These substances were nominated with sufficient supporting information to permit FDA to evaluate them and they may be eligible for inclusion on the 503B bulks list. However, FDA has identified significant safety risks relating to the use of these substances in compounding pending further evaluation, and therefore does not intend to adopt the policy described for the substances in category 1. If FDA adds a substance to Category 2, it will publish a public communication (e.g., a safety alert) describing the safety risks and will post the communication on FDA's human drug compounding website advising that the substance has been added to Category 2 and is no longer eligible for the policies that apply to substances in Category 1.

503B Category 3 – Substances Nominated for the Bulks List Without Adequate Support: These substances may be eligible for inclusion on the 503B bulks list, but were nominated with insufficient supporting information for FDA to evaluate them. These substances can be re-nominated with sufficient supporting information through a docket that FDA has established, as discussed below in section III.B.

FDA, Interim Policy on Compounding Using Bulk Drug Substances Under Section 503B of the Federal Food, Drug, and Cosmetic Act (January 2017) ("Interim Policy"), available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/interim-policy-compounding-using-bulk-drug-substances-under-section-503b-federal-food-drug-and.

38.     FDA stated in its Interim Policy that when a substance is nominated in response to the docket it opened on October 27, 2015, "FDA will determine whether the nomination is supported with sufficient information to allow FDA to evaluate it. After FDA makes that determination, the nominated substance will be placed in one of the three categories described in section II.B.2 above, and the categorization will be published on the FDA website." Interim Policy at 9.

39.     FDA said it "generally expects to categorize bulk drug substances nominated to the October docket and to publish updated categories on its website on the first business day of each month." Interim Policy at 9. In fact, FDA has not categorized many of the bulk drug substance that have been nominated for the 503B Bulks List. And FDA has not published updates categorizing nominated substances on a monthly basis.

40.     For example, OFA nominated the following 18 bulk drug substances more than three years ago which FDA has not categorized:

| Substance | Nomination ID | Date FDA Received | Regulations.gov URL |
|---|---|---|---|
| Testosterone Enanthate | FDA-2015-N-3469-0084 | 6/11/18 | www.regulations.gov/document?D=FDA-2015-N-3469-0084 |
| Benzoyl peroxide | FDA-2015-N-3469-0104 | 7/23/18 | www.regulations.gov/document?D=FDA-2015-N-3469-0104 |
| Iodoquinol | FDA-2015-N-3469-0128 | 7/23/18 | www.regulations.gov/document?D=FDA-2015-N-3469-0128 |
| Lidocaine | FDA-2015-N-3469-0133 | 7/23/18 | www.regulations.gov/document?D=FDA-2015-N-3469-0133 |
| Tetracaine | FDA-2015-N-3469-0150 | 7/23/18 | www.regulations.gov/document?D=FDA-2015-N-3469-0150 |
| Methadone hydrochloride | FDA-2015-N-3469-0170 | 8/17/18 | www.regulations.gov/document?D=FDA-2015-N-3469-0170 |
| Hydrogen peroxide | FDA-2015-N-3469-0206 | 10/8/18 | www.regulations.gov/document?D=FDA-2015-N-3469-0206 |
| Amiodarone Hydrochloride (HCl) | FDA-2015-N-3469-0230 | 10/31/18 | www.regulations.gov/document?D=FDA-2015-N-3469-0230 |
| Isoproterenol Hydrochloride | FDA-2015-N-3469-0234 | 10/31/18 | www.regulations.gov/document?D=FDA-2015-N-3469-0234 |
| Gatifloxacin | FDA-2015-N-3469-0255 | 3/4/19 | www.regulations.gov/document?D=FDA-2015-N-3469-0255 |
| Prednisolone sodium phosphate | FDA-2015-N-3469-0274 | 4/24/19 | www.regulations.gov/document?D=FDA-2015-N-3469-0274 |
| Levocarnitine | FDA-2015-N-3469-0278 | 5/1/19 | www.regulations.gov/document?D=FDA-2015-N-3469-0278 |
| Nicotinamide Adenine Dinucleotide | FDA-2015-N-3469-0281 | 5/1/19 | www.regulations.gov/document?D=FDA-2015-N-3469-0281 |
| Azithromycin | FDA-2015-N-3469-0284 | 5/9/19 | www.regulations.gov/document?D=FDA-2015-N-3469-0284 |
| Dorzolamide | FDA-2015-N-3469-0287 | 5/9/19 | www.regulations.gov/document?D=FDA-2015-N-3469-0287 |
| Latanoprost | FDA-2015-N-3469-0288 | 5/9/19 | www.regulations.gov/document?D=FDA-2015-N-3469-0288 |
| Loteprednol | FDA-2015-N-3469-0289 | 5/9/19 | www.regulations.gov/document?D=FDA-2015-N-3469-0289 |
| Timolol | FDA-2015-N-3469-0290 | 5/9/19 | www.regulations.gov/document?D=FDA-2015-N-3469-0290 |

| | | | |
|---|---|---|---|
| Ipamorelin acetate | FDA-2015-N-3469-0293 | 5/13/19 | www.regulations.gov/document?D=FDA-2015-N-3469-0293 |

41.     FDA also has not categorized the following 14 bulk drug substances which OFA

nominated between June 2020 and December 2021:

| Substance | Nomination ID | Date FDA Received | Regulations.gov URL |
|---|---|---|---|
| Gonadorelin acetate | FDA-2015-N-3469-0311 | 6/15/20 | www.regulations.gov/document?D=FDA-2015-N-3469-0311 |
| Bimatoprost | FDA-2015-N-3469-0326 | 3/1/21 | www.regulations.gov/document/FDA-2015-N-3469-0326 |
| Fluoruracil | FDA-2015-N-3469-0324 | 3/1/21 | www.regulations.gov/document/FDA-2015-N-3469-0324 |
| Minocycline hydrochloride | FDA-2015-N-3469-0325 | 3/1/21 | www.regulations.gov/document/FDA-2015-N-3469-0325 |
| Tofacitinib citrate | FDA-2015-N-3469-0329 | 3/1/21 | www.regulations.gov/document/FDA-2015-N-3469-0329 |
| Tranexamic acid | FDA-2015-N-3469-0327 | 3/1/21 | www.regulations.gov/document/FDA-2015-N-3469-0327 |
| Doxycycline hyclate | FDA-2015-N-3469-0342 | 5/27/21 | www.regulations.gov/document/FDA-2015-N-3469-0342 |
| Isotretinoin | FDA-2015-N-3469-0342 | 5/27/21 | www.regulations.gov/document/FDA-2015-N-3469-0342 |
| Trimethoprim | FDA-2015-N-3469-0342 | 5/27/21 | www.regulations.gov/document/FDA-2015-N-3469-0342 |
| Valacyclovir hydrochloride | FDA-2015-N-3469-0342 | 5/27/21 | www.regulations.gov/document/FDA-2015-N-3469-0342 |
| Sulfamethoxazole | FDA-2015-N-3469-0346 | 7/5/21 | www.regulations.gov/document/FDA-2015-N-3469-0346 |
| Naltrexone hydrochloride | FDA-2015-N-3469-0349 | 8/11/21 | www.regulations.gov/document/FDA-2015-N-3469-0349 |
| Capsaicin | FDA-2015-N-3469-0351 | 9/21/21 | www.regulations.gov/document/FDA-2015-N-3469-0351 |
| Nicotinamide riboside chloride | FDA-2015-N-3469-0352 | 12/23/21 | www.regulations.gov/document/FDA-2015-N-3469-0352 |

42.     FDA's failure to follow its own Interim Policy is contributing to FDA's

unreasonable delay in identifying the bulk drug substances for which there is a clinical need. By

failing to promptly categorize bulk drug substances nominated for the 503B Bulks List as it said

it would, FDA is keeping nominators such as OFA in the dark as to whether they provided FDA

with sufficient information to evaluate the nominated bulk drug substance or whether they need to provide additional information before FDA will evaluate them.

## CLAIMS FOR RELIEF

### Count I: Violation of the Administrative Procedure Act (5 U.S.C. §§ 555(b) & 706(1))

43.    Plaintiff incorporates by reference paragraphs 1-42.

44.    The APA requires this Court to "compel agency action" that has been "unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

45.    Section 555(b) of the Administrative Procedure Act requires each agency "to conclude a matter presented to it" "within a reasonable time," 5 U.S.C. § 555(b). Section 706(1) provides that a reviewing court "shall compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

46.    "Agency action" means the "whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).

47.    HHS and FDA each are an "agency" for purposes of the APA. See 5 U.S.C. §§ 551(1), 701(b)(1).

48.    Defendants' identification of the bulk drug substances for which there is a clinical need pursuant to 21 U.S.C. § 353b(a)(2)(A)(i) would be an "agency action" within the meaning of 5 U.S.C. § 551(13) and a "final agency action" within the meaning of 5 U.S.C. § 704.

49.    Section 503B of the FD&C Act imposes a mandatory duty on the HHS Secretary to identify the bulk drug substances for which there is a clinical need.

50.    5 U.S.C. § 555(b) imposes a mandatory duty on the HHS Secretary to do so within a reasonable time.

51.     Together, Sections 555(b) and 706(1) "indicate a congressional view that agencies should act within reasonable time frames and that courts designated by statute to review agency actions may play an important role in compelling agency action that has been improperly withheld or unreasonably delayed." *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 76–77 (D.C. Cir. 1984).

52.     Defendants' failure after eight years to identify the bulk drug substances for which there is a clinical need, including its failure to identify a single bulk drug substance for compounding sterile drugs, even though Congress intended 503B facilities to compound sterile drugs, constitutes agency action "unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), and a failure by the agency to "conclude a matter presented" to the agency "within a reasonable time," *id.* § 555(b).

53.     Under 5 U.S.C. § 706(1), the Court should issue an injunction compelling Defendants to identify the bulk drug substances for which there is a clinical need, including for compounding sterile drugs, within a reasonable time. At a minimum, FDA should promptly categorize all uncategorized nominations under its Interim Policy and do so going forward on a monthly basis as FDA had said that it would but has not.

54.     Under 28 U.S.C. § 2201, this Court should declare that Defendants' failure to identify the bulk drug substances for which there is a clinical need is an agency action unlawfully withheld or unreasonably delayed within the meaning of 5 U.S.C. § 706(1).

55.     OFA has no other adequate remedy that is an alternative to the remedies requested in this Complaint.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

a) Declare that Defendants have violated the APA by unlawfully withholding and unreasonably delaying performance of their duty to identify the bulk drug substances for which there is a clinical need under Section 503B of the FD&C Act;

b) Order Defendants to perform within a reasonable time their obligation to identify the bulk drug substances for which there is a clinical need under Section 503B of the FD&C Act, including by (1) categorizing all uncategorized nominations under FDA's Interim Policy within thirty days and doing so going forward within thirty days for any new nominations and (2) issuing an initial status report within thirty days providing timelines for action on all nominations that have been pending more than one year and quarterly status reports thereafter describing efforts made during the preceding three months and expected to be made during the next three month period to meet those timelines.

c) Retain jurisdiction to ensure compliance with the Court's Orders and that Defendants proceed with diligence;

d) Award Plaintiff its reasonable costs of litigation, including reasonable attorneys' fees, expert fees, and costs; and

e) Grant such other and further relief as the Court may deem just and proper.

Dated: June 14, 2022                              Respectfully submitted,


                                                  /s/ *Thomas E. Hogan*
                                                  Thomas E. Hogan
                                                  D.C. Bar No. 492003

                                                  **Baker & Hostetler LLP**
                                                  Washington Square, Suite 1100
                                                  1050 Connecticut Avenue, NW
                                                  Washington, D.C. 20036-5304
                                                  Telephone: (202) 861-1500
                                                  Facsimile: (202) 861-1783
                                                  thogan@bakerlaw.com

                                                  *Counsel for Plaintiff Outsourcing Facilities*
                                                  *Association*